RECEIVED
IN ALEXANDRIA, LA.

AUG 1 4 2013

TONY R. MOORE, CLERK
BY
DEPUTY

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| JEROLENE ETHEL KAY COOPER-MCCLINTOCK, ET AL. | CIVIL ACTION NO. 11-1934 |
| -vs- | JUDGE DRELL |
| THE UNITED STATES OF AMERICA | MAGISTRATE JUDGE KIRK |

## RULING

Before the Court is a Motion for Summary Judgment filed by the United States. (Doc. 33). All responses have been filed, and the matter is ready for disposition. For the following reasons, the motion will be DENIED.

I.    **Background**

This civil case involves the death of Don Arch Cooper. The Complaint alleges Mr. Cooper was a patient at the VA Medical Center in Pineville, Louisiana from February 4, 2005 until his death on February 19, 2005. (Doc. 1). Plaintiffs filed a wrongful death claim under the Federal Tort Claims Act (FTCA) against the United States after presenting their grievance to the Department of Veterans Affairs. (Doc. 1).

Scott Gremillion, the Associate Chief of Staff for Geriatrics at the VA Medical Center, claims Mr. Cooper executed a "Do Not Resuscitate" order (DNR) on October 1, 2003. (Docs. 1; 39-2). The record does not contain a copy of Mr. Cooper's DNR despite the fact that the DNR purports to have been scanned in Mr.

Cooper's medical records. (Doc. 39-2). The record does contain a "Patient Rights Advance Directive Acknowledgment Statement" from February 24, 2004 wherein Mr. Cooper claimed not to have executed a living will or advance directive. (Doc. 39-2). Importantly Plaintiffs claim at the time of any 2003 DNR order, and particularly on October 1, 2003, Mr. Cooper was under psychiatric care for paranoid schizophrenia. (Docs. 1; 39-2).

Dr. Horacio Guerra dictated a discharge summary on March 1, 2005 indicating Mr. Cooper entered the VA Medical Center for treatment of nosocomial (hospital-acquired) pneumonia, aspiration, and neurogenic dysphagia. (Doc. 39-2). Dr. Guerra also noted Mr. Cooper was diagnosed with schizophrenia, paranoid schizophrenia, chronic obstructive pulmonary disease, and cerebrovascular disease. (Doc. 39-2).

During this hospitalization and throughout the medical records, Mr. Cooper repeatedly asked for water, coffee, milk, and food. Medical records from Dr. Guerra and licensed practical nurse (LPN) Patricia Hicks acknowledge that Mr. Cooper was told he was in "NPO" status (aka "nothing by mouth") because of dysphagia and aspiration pneumonia. (Doc. 39-2). This meant that if Mr. Cooper ate anything, he was in danger of ingesting it into his bronchial system. According to Dr. Gremillion, Mr. Cooper refused a feeding tube and vocalized his desire to eat and drink. (Doc. 39-2).

Medical records from registered nurse (RN) Kathryn Carter indicate Mr. Cooper was given intravenous therapy throughout his hospitalization. (Doc. 39-2). RN Tonya Schram documented that Mr. Cooper refused intravenous access while he was in NPO status on February 12, 2005. (Doc. 39-2). However, the records from RN Carter, RN Mary Brinkerhoff, and RN Scott Riche later attest he was given intravenous therapy three days later, on February 15, 2005, and the intravenous needle was in place and intact on February 18, 2005. (Doc. 39-2).

On February 17, 2005, Dr. David C. Daniel, Jr., a clinical psychologist, recorded that Mr. Cooper wanted all "helpful treatment," and that he was feeling better than when he refused treatment. (Doc. 39-2). Dr. Daniel's records show that he informed the floor nurse that Mr. Cooper was asking for all treatment, and this nurse told Dr. Daniel she was aware Mr. Cooper had changed his mind about his DNR order. (Doc. 39-2). Dr. Daniel suggested Mr. Cooper's physician be made aware of the change because Dr. Daniel believed Mr. Cooper was still regarded by hospital staff as in DNR status. (Doc. 39-2). Dr. Daniel also found Mr. Cooper to be competent for medical judgment at that time. (Doc. 39-2).

Michael W. Roach, a licensed clinical social worker, documents that he went to speak with Mr. Cooper on February 18, 2005. (Doc. 39-2). Mr. Roach asked Mr. Cooper about whether he would accept a feeding tube. Mr. Cooper's response to the feeding tube question was "whatever the doctor thinks." (Doc. 39-2). Notably, Defendant's medical ethics consultant, William Winslade, Ph.D, attempts to claim

Mr. Cooper made this statement in relation to all of his medical treatment, but the record suggests Mr. Cooper's statement only applied to the use of a feeding tube. (Docs. 33-6; 39-2).

On February 19, 2005, LPN Helen Briggs found Mr. Cooper with agonal breathing and did not resuscitate him. (Doc. 39-2). Plaintiffs allege LPN Briggs and Dr. Juan Carlos Martinez, along with the rest of the VA medical staff, did not resuscitate Mr. Cooper because they continued (erroneously) to rely on his DNR status. The cause of death reflected in the medical records was listed as "sepsis secondary to aspiration pneumonia." (Doc. 39-2).

In the current motion, Defendant argues this medical malpractice case should be dismissed because Plaintiffs have failed to provide an expert opinion saying there was a breach in the standard of care or causation and that Plaintiffs cannot fulfill their burden of proof. (Doc. 33).

II.   **Law and Analysis**

   **A. Motion for Summary Judgment**

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). We consider all "evidence in the light most favorable to the party resisting the motion."

Trevino v. Celanese Corp., 701 F.2d 397, 407 (5th Cir. 1983). It is important to note that the standard for a summary judgment is two-fold: (1) there is no genuine dispute as to any material fact, *and* (2) the movant is entitled to judgment as a matter of law.

### B. Federal Tort Claims Act (FTCA)

The FTCA constitutes a limited wavier of the federal government's immunity from suit.  See Linkous v. United States, 142 F.3d 271, 275 (5th Cir. 1998). "The United States has partially waived its sovereign immunity in the FTCA, which subjects the United States to tort liability if a private person would be liable for the same act under state law." Life Partners, Inc. v. United Sates, 650 F.3d 1026, 1030–31 (5th Cir. 2011) (citing 28 U.S.C. § 1346(b)).

### C. Do Not Resuscitate (DNR) Orders in Louisiana

An adult may "make a written declaration directing the withholding or withdrawal of life-sustaining procedures in the event such person should have a terminal or irreversible condition." La. R.S. 40:1299.58.3. The written declaration must be signed by the declarant in the presence of two witnesses. Id.  It is also "the responsibility of the declarant to notify his attending physician that the declaration has been made." Id. An oral declaration may be sufficient, but "[i]f the declaration is oral or nonverbal, the physician shall promptly make a recitation of the reasons the declarant could not make a written declaration and make the recitation a part of the patient's medical records." Id.

As observed, we do not have a copy of the purported executed 2003 DNR in the medical or court record. The existence and terms of a valid DNR are genuine disputes of material fact. In so finding, first we note that Mr. Cooper indicated on the "Patient Rights Advance Directives Acknowledgment Statement" that he had not executed a living will/advance directive as of February 24, 2004. (Doc. 39-2). We also note that Mr. Cooper's records from Linda Boothe, a medical records technician, indicate the DNR was supposedly scanned into the medical record as an attachment on February 15, 2005. (Doc. 39-2). However, this DNR order itself was not included in the VA's medical records because the VA apparently failed to view and print the attachment with the rest of the records. (Doc. 39-2). No supplementation of the court record with an actual copy of the DNR order has been made.

Thus, whether an expert is needed or not is a premature question. The more basic question of the existence and terms of the purported DNR order of 2003 must first be answered.

III.   **Conclusion**

For the reasons detailed above, Defendant's Motion for Summary Judgment (Doc. 33) will be denied at this time. This determination does not prevent

Defendant from requesting leave to refile a Motion for Summary Judgment if the

proper supportive evidence exists.

SIGNED on this <u>14th</u> day of August, 2013 at Alexandria, Louisiana.

Dee D. Drell, Chief Judge
United States District Court